# EXHIBIT

# A

1    raised to us in the past.  And as I do with any

2    staff person, as we do at ABRA, some of the first

3    questions that we ask especially when performance

4    is suffering or at least we observe performance

5    as being compromised is, is anything, you know,

6    compromising that performance, anything --

7    anything wrong with that person, et cetera,

8    because they're -- what I think a manager or a

9    supervisor has to then go to referring employees

10   to the proper services or considerations before

11   moving any further, let alone with disciplinary

12   actions.  So the answer to your question is no.

13       Q    Okay.  Well then let me ask you this,

14   and this is probably my last question.

15            Let's just say an employee had reached

16   out to HR to seek assistance with FMLA or other

17   reasonable accommodations that would be offered

18   to them prior to recommending the employee for

19   termination as you as the supervising official,

20   do you do a check with HR to verify that they

21   don't have any pending paperwork they're

22   considering and you probably was not made aware

1      of before you recommend termination?

2          A     I believe that refers or reflects back

3      to the Douglas Factors.  And then also we consult

4      very closely with our HR and our administrative

5      officer and our General Counsel, and we weren't

6      made aware of anything like that.

7          And so no, we certainly wouldn't move

8      forward had information been provided but -- or

9      at  least  that  was  shared  but  that  was  never

10     shared with us, and we were never known or made

11     aware of any type of health concerns.

12         Q     And so is your testimony that as you

13     signed off on the Notice of Termination, you in

14     fact did check with HR and they hadn't been aware

15     of any FMLA requests from Ms. Fowler.  Is that

16     correct?

17         A     I can't answer -- well I did check

18     with  HR  and  I  worked  very  closely  with  our

19     administrative officer, and when we moved forward

20     with this action.

21         Q     Were  you  made  aware  that  Ms.  Fowler

22     was attempting or was contemplating retiring in

1    the coming months?

2         A    No.    I never heard that from her

3    directly, no.

4         Q    Who did you hear it from directly?

5         A    I didn't hear it from anyone.    I'm

6    just saying I never heard it from her directly,

7    and hearsay to me from other people is simply

8    hearsay.

9         Q    Okay.  But if you check with HR or the

10   General Counsel and they advised you that Ms.

11   Fowler was in fact considering retiring, and in

12   fact had given the Agency notice of her intended

13   end date would that change the desire to

14   terminate Ms. Fowler at the time that you

15   proposed the termination?

16        A    That's a hypothetical.  I really can't

17   answer.  I didn't have that information in front

18   of me.

19        Q    Okay.  I have nothing further.

20             JUDGE DOHNJI: Thank you.  Mr. Martini?

21                REDIRECT EXAMINATION

22             BY MR. MARTINI:

1      Q    Mr. Gordy, you were asked about

2  whether Ms. Fowler had accused you of bumping her

3  and yelling at her.  Did you ever bump her?

4      A    No.

5      Q    There were also questions about Ms.

6  Fowler staying past the time she was allowed to

7  stay in the office.  Regardless of the permission

8  issue, do you believe that her extra time in the

9  office helped her performance?

10      A    Absolutely not.

11      Q    Okay.  And as a housekeeping matter,

12  if you could please turn to page 55?

13      A    I'm sorry, Mr. Martini, you said page

14  55?

15      Q    Yes, sir.

16      A    Okay.  Got it.

17      Q    Do you know what this document is?

18      A    It is the Agency's Final Decision for

19  Removal of Ms. Fowler.

20               (Whereupon, the document was marked

21               for identification as Agency Exhibit

22               Number 7.)

1        Q       Do you know who drafted it?

2        A       Yes, my director, ABRA's Director,

3    Fred Moosally.

4        Q       Does it appear to be modified in any

5    way since the time that Director Moosally drafted

6    it? You were muted if you answered, I'm sorry.

7        A       My apologies. No, it does not appear

8    to be.

9        Q       Okay. Your Honor, I'd like to move

10   Agency's Exhibit 7 into evidence.

11               JUDGE DOHNJI: Any objection, Mr.

12   Tucker?

13               MR. TUCKER: Only to the extent that

14   he's not Director Moosally, and only Director

15   Moosally would be able to answer whether or not

16   it was changed, whether it was the final version.

17               JUDGE DOHNJI: Okay. We do have

18   Director Moosally testifying if I'm not mistaken.

19   Is that correct, Mr. Martini?

20               MR. MARTINI: We're actually not going

21   to be able to get a hold of him today. His

22   schedule wouldn't allow it.

1          JUDGE DOHNJI: Okay.   Because this

2    document is already in the record, I'm just going

3    to go ahead and allow it because I'm sure it was

4    submitted by the employee herself during her

5    initial petition for appeal, so I'm going to go

6    ahead and allow the document.

7               (Whereupon, the document previously

8               marked for identification as Agency

9               Exhibit 7 was received in evidence.)

10          JUDGE DOHNJI: Okay.

11          MR. MARTINI: Okay.  Thank you.  I have

12   no further questions for Mr. Gordy, and I

13   appreciate your time, sir.

14          JUDGE DOHNJI: Thank you for testifying

15   today.  And if we do need you in the future, Mr.

16   Martini will get a hold of you.

17               (Witness excused.)

18          JUDGE DOHNJI: Okay. Since Mr. Moosally

19   is not testifying, is the Agency resting its

20   case?

21          MR. MARTINI: We are, Your Honor.

22          JUDGE DOHNJI: Okay.  Thank you.  And

1    Mr. Tucker, are you ready to get your first

2    witness on the stand?  We can take a five-minute

3    break so you can reach out to them and then we

4    can go from there.  So we can come back at 3:30.

5              MR. TUCKER: Your Honor, I just want to

6    put something on the record that we reserve --

7              JUDGE DOHNJI: Okay.

8              MR. TUCKER:  -- we have reserved the

9    right to call any and all the witnesses that the

10   Agency had put on its -- had intended to call.

11   So we still plan to call Director Moosally.  But

12   just because they've decided not to use him now

13   doesn't mean we're going to give up our right to

14   use and call him.  So we will be calling Director

15   Moosally.  I'll work with the Agency to find out

16   when he can be available, but we are going to be

17   calling him.

18             JUDGE DOHNJI: Okay.  But we do have

19   the evidentiary hearing scheduled for today and

20   tomorrow.  So if you're calling him, it has to be

21   between today and tomorrow.

22             MR. TUCKER: That's fine.

```
 1              JUDGE DOHNJI: Okay.  So yes, so we're

 2    going to take a little break initially and we

 3    said we'll come back to 3:30 but it's already

 4    3:27 so let's do it at 3:35 and we can contact

 5    the next witness.

 6              MR. TUCKER: Okay, Judge.

 7              JUDGE DOHNJI: Thank you.

 8              MR. MARTINI: Thanks.

 9              (Whereupon, the above matter went off

10    the record at 3:27 p.m. and resumed at 3:42 p.m.)

11              MR. TUCKER: May I inquire, Your Honor?

12              JUDGE DOHNJI: You may proceed.

13              MR. TUCKER: Thank you.

14    Whereupon,

15                      LORI FOWLER

16    was called as a witness for the Employee after

17    having been first duly sworn, was examined and

18    testified as follows:

19                   DIRECT EXAMINATION

20              BY MR. TUCKER:

21         Q    Good afternoon, Ms. Fowler.  Please

22    state your full name for the record.
```

```
1        A     Lori Fowler.

2        Q     And by whom are you employed?

3        A     Say it again, I didn't hear you.

4        Q     By whom are you employed?

5        A     Oh, I'm employed with DCRA, Department

6   of Consumer Regulatory Affairs.

7        Q     And  how  do  you  know  Mr.  Margaret

8   Fowler?

9        A     She's my mom.

10       Q     And how did you become involved with

11  her and her interactions with ABRA?

12       A     I'm her caregiver, so I take her to

13  all her appointments and things of that nature,

14  and take her back to her job.

15       Q     Did there come a time that you became

16  aware that your mother was suffering from some

17  health-related issues?

18       A     Yes.

19       Q     When was that?

20       A     Probably in the beginning of -- it

21  started in 2018, at the end of 2018 until now.

22       Q     And would you say -- if you can, would
```

1   you say it got progressively worse over time or

2   no?

3       A    Yes.

4       Q    What specifically was she having

5   difficulty with, if anything?

6       A    She has difficulty walking.  She has

7   difficulty with her hands, bilateral, both hands.

8   She has difficulty with her skin.  She has

9   difficult with her weight.  She has difficulty

10  with a lot of things.

11      Q    Okay.  And what hours was your mother

12  keeping as it relates to her time working at

13  ABRA?

14      A    Okay.  Can you repeat that again, I'm

15  sorry.

16      Q    Sure.  What hours was she keeping, in

17  other words, what schedule was your mother on

18  while she was working at this time?

19      A    She was on an AWS schedule where, I

20  believe she was off on Monday.  And she worked

21  10-hours days, Tuesday through Friday.

22      Q    Did there come a time whether 2019 or

1    2018 where she was coming in on the weekend?

2         A    Yes.

3         Q    How often would that happen?

4         A    She would do that a lot.

5         Q    And did there come a time, Ms. Fowler,

6    where your mother had issues with her hands?

7         A    Yes.

8         Q    What particularly?

9         A    She had carpal tunnel in both her

10   hands.

11        Q    And if you know, was she diagnosed

12   with carpal tunnel?

13        A    Yes, she was.

14        Q    When was that?

15        A    That was last year probably around --

16   around maybe about June maybe.  I believe around

17   June.

18        Q    Okay.  And did there come a time where

19   your mother filled out paperwork as it relates to

20   her carpal tunnel?

21        A    Yes, she did.

22        Q    And when you say paperwork what

1    specifically did you assist your mother with?

2         A    Okay.   I assist her with workmen's

3    comp, compensation and her FMLA.

4         Q    When was her worker's comp paperwork

5    submitted?

6         A    She started the work process July the

7    3rd, I believe.

8              MR. TUCKER: Ms. Clarke, have you

9    received Plaintiff's Exhibits?

10             MS. CLARKE: I have not.  Did you want

11   me to share it is that why you wanted me?

12             Oh, okay.   Do you not know how to

13   share it?  Because I can walk you through it?

14             MR. TUCKER: Okay.

15             MS. CLARKE: If you have the document

16   you want to share up, just make sure it's up.

17   Oh, actually I don't have it right now.

18             Mr. Tucker?  Seems like we lost his

19   video.

20             (Whereupon, the above matter went off

21   the record at 3:50 p.m. and resumed at 3:53 p.m.)

22             BY MR. TUCKER:

1      Q     Ms. Fowler, I'm sharing with you

2    what's been marked as Employee's Exhibit number

3    4.

4               (Whereupon, the document was marked

5               for identification as Employee Exhibit

6               Number 4.)

7               BY MR. TUCKER:

8      Q     Do you see that?

9      A     Yes, I see it.

10     Q     And it appears to be the date looks

11   like January 14th, 2020, is that correct?  No,

12   it's an email, correct?

13     A     The email, yes.

14     Q     Right.  But this is from July 3rd,

15   2019, is that correct?

16     A     Yes.  That's the admission.

17     Q     So, walk me through how this all came

18   to be?

19     A     So, my mom when she would go to the

20   doctor she would have pains in both her hands.

21   And we were wondering what it was.  And her

22   doctor told her that he set up her appointment --

1    at first he said it looks like you have carpal

2    tunnel.    But  then  she  referred  to  go  to  a

3    neurologist and the neurologist stated that she

4    does has carpal tunnel.

5           So, we found that out because my mom

6    had  --  her  work  is  strictly  working  on  the

7    computer.  That's the only way the pain is from

8    the job is from the computer, so we put in a

9    claim for workman's comp.

10          Q    And who is this paperwork submitted

11   to?

12          A    This  is  submitted  to  the  Office  of

13   Risk  Management  and  they  also  notified  the

14   employing entity.

15          Q    Did you contact anyone at the Agency

16   as relates to this?

17          A    Yes, Human Resources.

18          Q    Okay.  Who particularly?

19          A    Camille Robinson.

20          Q    And  I  noticed  that  the  document

21   appears to be Form 1, which is Employee's Notice

22   of Injury and Claim for Continuation of Pay, is

1    that correct?

2         A    Yes.

3         Q    And did you assist your mother filling

4    out these documents?

5         A    Yes, I did.

6         Q    And the diagnosis here you put June

7    18th, 2019, is that correct?

8         A    Yes.

9         Q    And in the cause of injury, did you

10   put data entry working with, creating and lifting

11   file folders, is that correct?

12        A    Yes.

13        Q    And who is Dr. Sabloff and Dr. Moore?

14        A    Dr. Sabloff is her orthopedist and Dr.

15   Moore is her neurologist.

16        Q    Ms. Fowler, do these forms that have

17   been identified as Employee Exhibit Number 4

18   represent a fair and accurate representation of

19   the workman's compensation paperwork that you

20   filled out for your mother back in June of 2019?

21   You're muted.

22        A    Yes.

1        Q     And outside of it being a copy does it

2   reflect a fair and accurate representation of the

3   paperwork that you submitted on behalf of your

4   mother's worker's compensation claim back in June

5   of 2019?

6        A     Yes.

7        Q     Your Honor, at this time I'd like

8   what's been previously marked as Employee's

9   Exhibit 4 be moved into evidence.

10            JUDGE DOHNJI: Do you have any

11   objection, Mr. Martini?

12            MR. MARTINI: I do not.

13            JUDGE DOHNJI: Okay.    Employee's

14   Exhibit 4 is entered into evidence.

15                 (Whereupon, the document previously

16                 marked for identification as Employee

17                 Number Exhibit 4 was received in

18                 evidence.)

19            BY MR. TUCKER:

20        Q     You testified, Ms. Fowler, that not

21   only did you submit worker's compensation forms

22   but that there came a time when you also

1  submitted FMLA paperwork, is that correct?

2       A    Correct.

3       Q    Okay.  And, again, could you speak to

4  why did your mother fill to FMLA paperwork at

5  that time?

6       A    Say that again because you broke up.

7       Q    Did there come a time where you filled

8  FMLA paperwork for your mother, if so, how many

9  times and why did you do so?

10       MS. CLARKE: You're muted, Ms. Fowler.

11  Can you unmute yourself?

12       THE WITNESS: Sorry about that.  I

13  filled out the FMLA paperwork for my mom because

14  my mom is sick.  I mean, she's still sick.  I

15  also filled it out for myself as well so I can

16  take care of her.

17       BY MR. TUCKER:

18       Q    Okay.  Ms. Fowler, I'm going to have

19  you look at what's been identified as Employee's

20  Exhibit 1,, excuse me, Exhibit Number 2.

21       A    Okay.

22       Q    Do you recognize this document?

1          A      Yes.

2          Q      Is this part of FMLA paperwork that

3    you submitted back in 2019 on behalf of your

4    mother?

5          A      Yes.

6          Q      And this is the date here, July 26,

7    2019?

8          A      Yes.

9          Q      And it appears signed off by Ms.

10   Robinson on August 28, 2019, is that correct?

11         A      Yes.

12         Q      Again, is this part of the paperwork

13   you submitted to your mother as it relates to her

14   request for Family Medical Leave under the Family

15   Medical Leave Act?

16         A      Yes.

17         Q      And outside of this being a copy of

18   the document is this a fair and accurate

19   representation of the paperwork that you

20   submitted on behalf of your mother's FMLA request

21   to the Agency?

22         A      Yes, it is.

1          (Whereupon, the document was marked

2          for identification as Employee Exhibit

3          Number 2.)

4          MR. TUCKER:   At this time I'd like

5    what's been previously marked as Employee's 3 be

6    moved into evidence as Employee 3 in evidence.

7          JUDGE   DOHNJI:   Any   objection,   Mr.

8    Martini?

9          MR. MARTINI: No objection.

10         JUDGE DOHNJi: Okay.   Employee's 3 is

11   entered into evidence.

12         MR. MARTINI: I'm sorry, just to be

13   clear.   I have no objection to Employee's 2, the

14   FMLA paperwork.

15         JUDGE   DOHNJi:   Okay.      So   it's

16   Employee's 2 and not 3.   Okay.   Employee's 2 is

17   entered into evidence.

18         (Whereupon, the document previously

19         marked for identification as Employee

20         Number 2 was received in evidence.)

21         JUDGE DOHNJI: And while we're at it I

22   know I just said I was going to email the exhibit

1    to the Court Reporter, however, I'd rather the

2    parties email your exhibits to the Court

3    Reporter.

4              BY MR. TUCKER:

5         Q    I'm showing you medical records

6    connected to Employee's Exhibit Number 3.

7              (Whereupon, the document was marked

8              for identification as Employee's

9              Exhibit Number 3.)

10             BY MR. TUCKER:

11        Q    Do you see that, Ms. Fowler?

12        A    Yes, I do.

13        Q    Okay.  And was this the paperwork that

14   was submitted in connection with your mother's

15   request for FMLA?

16        A    Yes, it was.

17        Q    And in preparing your mother's

18   paperwork is this part of the medical records

19   that was submitted on her behalf for the Agency's

20   consideration of FMLA time, under the FMLA Act?

21        A    Yes, it was.

22        Q    And at the time of submission these

1  documents were submitted to Ms. Robinson, the

2  Agency representative, is that correct?

3       A     Yes.   Some of them were hand given to

4  her as well and then I emailed them to her as

5  well, too.

6       Q     And when you say her, once again

7  you're referring to Ms. Camille Robinson?

8       A     Yes, Ms. Camille Robinson.

9       Q     And were all these records submitted

10 in connection with the FMLA request that you were

11 submitting on your mother's behalf?

12      A     Yes.

13      Q     At any point, Ms. Fowler, did the

14 Agency make a request for additional medical

15 documentation or had they advised you that they

16 didn't receive these documents?

17      A     No.

18      Q     Okay.  As you sit here today do these

19 documents   reflect   a   fair   and   accurate

20 representation of the medical documentation that

21 you submitted in connection with your FMLA

22 request to the Agency?

1      A      Yes.

2      Q      Okay.   At this time I'd like what's

3  been  previously  marked  as  Employees'  3,  Ms.

4  Fowler's medical records, be moved into evidence

5  as Employee's 3 in evidence.

6           JUDGE  DOHNJT:  Before  1  ask  you  if

7  there's any objection I just want the parties to

8  note   that   these   have   employee's   personal

9  information and when I sent out my orders i made

10  sure I told the parties to redact the personal

11  information because OEA would not do that.  And

12  the Superior Court, if this case ends up going to

13  Superior Court, the Superior Court is going to

14  request that the parties to come and redact these

15  documents.

16           So,  I  just  want  to  put  it  out  there

17  before you email it to the Court Reporter you

18  might want to redact the personal information

19  like Social Security, medical, but you may want

20  to redact that.

21           With that being said I'm going to go

22  over Mr. Martini.  Do you have any objection?

1          MR. MARTINI: Yes, I'm not sure that

2     we've established a foundation of when what

3     documents were submitted.  Ms. Fowler testified

4     that she turned all of these in on July 2019 or

5     most of them.  But many in this file are dated in

6     August.  So, it's unclear which documents she's

7     saying she submitted with that FMLA request so I

8     just don't feel that we've established what these

9     are as of yet.

10          JUDGE DOHNJI: Okay.  So, I'm going to

11    let Mr. Tucker answer, however, I'm going to say

12    for the purposes of this particular hearing we

13    have agreed that we're just trying to figure out

14    when the FMLA was signed or starting.  And from

15    my review of these documents it's showing the

16    FMLA was filed on — the request for FMLA was

17    filed on July 26.  So, that would be more

18    important to me.  The rest of the documents I

19    really don't care for.  The most important

20    document is the fact that she filed an FMLA and

21    I'll have to take that and go back and look into

22    when she was placed on the PIP and also see what

1    effect it had, if any, on her being on a PIP

2    during that FMLA.  So, that's really what is

3    important to me.  The rest of the dates on the

4    documents I really don't care for.

5         MR. MARTINI: All right.  Then we

6    withdraw our objection and --

7         JUDGE DOHNJI: Okay.  Thank you.

8         BY MR. TUCKER:

9         Q    Ms. Fowler, just as it relates to the

10   initial request for FMLA what was your immediate

11   concern as it relates to (a) the request and your

12   mother's condition which actually prompted your

13   action in the first place?

14        A    That she was depreciating in front of

15   me.  She didn't look like my mom anymore.  And

16   she was in pain.  So, I had to start taking her

17   to the doctor and she lost a tremendous amount of

18   weight like no other.  And she just wasn't

19   herself anymore.

20        Q    When you say your mother was

21   excruciating pain or pain period what pain was

22   she experiencing and what, if anything, did you

1  do at that time?

2      A   She was in pain as far as her hands

3  were concerned.   She couldn't do stuff.   She

4  couldn't button her clothes.   I would have to

5  assist her.   She — she walked hunchback when

6  she's never done that before.   And she has to

7  walk with a walker now because she can't keep her

8  balance.   So, those were concerning.   Those were

9  the concerning activities that I saw and her

10  family even saw it, too, so we started — I

11  started to take her to the doctor to see what was

12  going on because something wasn't right.

13      Q   So, Ms. Fowler, if it is told to you

14  that various supervisors that worked with your

15  mother on a day-to-day basis at the Agency, in

16  fact, it's been testified that they saw no

17  difference in your mother's appearance on a day-

18  to-day basis.   How would you respond to that?

19      A   I would say that is untrue because it

20  wasn't just internal, it was external.   You can

21  actually — depreciating in her system.

22      Q   Did your mother appear stressed to

1    you?

2         A    Very.

3         Q    And did she ever confide in you what

4    was stressing her at work?

5         A    Yes.

6         Q    What was that?

7         A    The fact that she was being harassed

8    by one of her superiors.  And that she would let

9    her director know and he wasn't doing anything

10   about it that stressed her out.

11        They nit-picked everything that she

12   did.  When others would be going and doing the

13   same thing and they wouldn't do anything with

14   them but they would nit-pick with her.  And it's

15   just a lot at her job.

16        Q    When you say particular supervisors

17   are you — what supervisor are you referring to?

18        A    Sean Gordy.

19        Q    Did you know Mr. Gordy?

20        A    No, I don't know him per se, no.

21        Q    You knew him to be her supervisor, is

22   that correct?

1          A      Yes.

2          Q      Did you a supervisor by the name of

3     Karen Jackson?

4          A      Yes.

5          Q      How did you know Karen Jackson?

6          A      My mom told me.

7          Q      Had you ever had any interactions with

8     Ms. Jackson?

9          A      No.  But I overheard people when I was

10    on the phone talking to my mom, and Ms. Jackson

11    came to her desk yelling and screaming at her

12    about a case.

13         Q      You were on the phone with your mom?

14         A      Yes.

15         Q      Okay.  When was that?

16         A      That happened around -- don't quote me

17    I can't really remember but around probably in

18    July or so.

19         Q      Was that July 2019?

20         A      I believe it was.  I wrote it down on

21    a piece of paper, I don't have it with me right

22    now.

1     Q    And do you remember why Ms. Jackson or

2    do you recall why Ms. Jackson was yelling at your

3    mother?

4     A    She was trying to tell my mother she

5    did something wrong and my mother was trying to

6    explain to her the situation and Ms. Jackson was

7    not trying to hear her.

8     Q    When you submitted the FMLA request to

9    the Agency did Ms. Robinson appear to you

10    surprised about the request?

11     A    No.

12     Q    Did there come a time when your mother

13    had to change her alternate work schedule?

14     A    Yes.

15     Q    Do you know why she had to make that

16    change?

17     A    Yes.  She had to accommodate her

18    doctors' appointments.

19     Q    And was that made known to the Agency?

20     A    Yes, it was.

21     Q    Ms. Fowler, at some point were you

22    made aware that your mom had decided that this

1    was too much for her and that she was just going

2    to go ahead and retire?

3         A    Yes.  It started to get more stressful

4    and her body started to shut down more.

5         Q    At some point she made the request,

6    she decided to — she decided to, specifically,

7    she gave them a date certain when she wanted to

8    retire?

9         A    Yes, she did.

10        Q    Did she consult with you in that

11   regard?

12        A    Yes, she did.

13        Q    And why did she decide that this was a

14   time period that she was going to retire?

15        A    Because she didn't feel like her body

16   could take it.

17        Q    And when was this date that she wanted

18   to retire?

19        A    She wanted to retire at the end of

20   February.  I'm sorry ---

21        Q    Ms. Fowler, is that February 2021?

22        A    Yes.  I believe — I'm not sure that —

1    I'm not sure of the year.  All I know it was the

2    end of --

3                (Telephonic Interference)

4         Q    If you know, did February represent

5    anything important in your mother's employment

6    history that prompted her to pick that time

7    period?

8         A    Yes, that was her birthday month.

9         Q    When you say birthday, it wasn't her

10   physical birthday, right?

11        A    No, it wasn't her physical birthday

12   but it would have been her birthday for her job,

13   I believe, that how long she'd been there.

14        Q    And did she express concern as it

15   relates to the specific time period and the

16   implications surrounding her retirement?

17        A    Yes, she did.

18        Q    Did there come a time period where

19   after — well, let me ask you.

20             If you know, did Ms. – did your mom

21   advise the Agency of her intention to retire

22   prior to them submitting paperwork for her

1   termination?

2        A    Yes, she created a -- she did a memo.

3        Q    And who was that memo sent to, if you

4   know?

5        A    I believe the memo had Sean Gordy on

6   it.  It had Fred Moosally, it had Karen Jackson.

7   It had Karen Jenkins, I believe, on it and I

8   think Camille was on it.  I'm sure Camille was

9   one.

10        MR. TUCKER: I have nothing further.

11        JUDGE DOHNJI:  Thank  you.   Your

12   witness, Mr. Martini.

13             CROSS-EXAMINATION

14        BY MR. MARTINI:

15        Q    Good afternoon, Ms. Fowler.

16        A    Good afternoon.

17        Q    You're close with your mother?

18        A    Yes.

19        Q    So, you helped her with all her

20   paperwork for, you know, doctors in her

21   professional life, right?

22        A    Yes.

1    Q    Okay.  And you testified that included

2    the paperwork that she submitted to the Office of

3    Risk  Management   for   Workman's   Compensation,

4    right?

5         A    Yes, I believe I submitted that to her

6    but, if not, I know that they stated that they

7    were submitted to her agent.

8         Q    Okay.  And you know that the Office of

9    Risk  Management  has  not  accepted  that  claim,

10   right?

11        A    No, because we've been in contact with

12   them to this day.  So, this is the first that

13   I've heard.

14        Q    Okay.  And you work at DCRA, right?

15        A    I do.

16        Q    And your work at DCRA does not enforce

17   identifying causation and medical issues, right?

18        A    No.

19        Q    So, essentially, you don't really know

20   for  sure  what  caused  your  mother's  alleged

21   workforce injury, right?

22        A    No.

1    Q     And I won't spend too much on this

2    point but you testified that the documents in, i

3    believe it was Exhibit 3, Employee's Exhibit 3

4    were submitted along with the July 2019, FMLA

5    request, right?

6    A     What I stated was that I gave some

7    documents, I had given some documents to Mrs.

8    Camille Robinson as the time progressed.  So, as

9    she possibly had different appointments, I would

10   then submit them to Mrs. Robinson.

11   Q     Okay.  Did you do that in batches or

12   just as each new medical record, you passed it

13   on?

14   A     It was done in several batches because

15   as you can see there's a lot of medical records

16   that my mom had.

17   Q     And do you recall when you sent the

18   last batch?

19   A     No, not off hand, I don't.

20   Q     You testified that your mother suffers

21   from excruciating pain, is that correct?

22   A     Yes.

1      Q    But that was not the case — that

2  didn't just start at her work at ABRA, right?

3      A    Can you repeat that question again,

4  I'm sorry, you broke up.

5      Q    I'm sorry about that.  Yes.  The

6  question was, the excruciating pain did not being

7  while your mother was working at ABRA, correct?

8      A    No, it did start while she was working

9  at ABRA.

10     Q    Do you recall the July 9th, 2019,

11  medical appointment that your mother attended?

12     A    Not off hand.  Like I said, she had a

13  lot of medical records so I can't keep up with

14  everything has been by paperwork but not memory,

15  no.

16     Q    That report says, "Patient still

17  experiences mild pain in the lumbar spine and

18  some numbness and tingling in both wrists,"

19  right?

20     A    Yes.

21     Q    And your mother was instructed to wear

22  a back brace and a wrist brace, right?

1     A    Yes.

2     Q    But she didn't wear those things to

3  work or, well, she didn't wear them to work,

4  right?

5     A    Yes, she did.

6     Q    Okay.  She didn't wear the wrist

7  braces to work, right?

8     A    No, she wore them to work.

9     Q    Do you recall the August 12, 2019,

10  medical appointment that your mother went to?

11  Well, were you at these appointment, I'm sorry, I

12  did not hear.

13     A    She wore my necklaces.

14     Q    She's lucky to have a daughter like

15  you.  So, again, the question is, do you recall

16  the August 12, 2019, appointment which was a

17  follow-up on pain in the hands?

18     A    Again, I can't remember but I was

19  there.  The paperwork is there, I was there.

20     Q    And that paperwork states that your

21  mother was not doing regular back exercises,

22  right?

1          A      I'm not sure.  I have to look at the

2     paperwork.

3          Q      Would it help if I pulled it up?

4               MR. TUCKER: Your Honor, I'm going to

5     object to the line of questioning.

6               JUDGE DOHNJI: And what is the basis?

7               MR. TUCKER: To go into specifics as to

8     whether or not she had back braces or whether or

9     not she produced wrist guards on a particular

10    doctor visit dates, I mean, there's no question

11    that  she  had  doctor  visits  and  we're  not

12    submitting it to make any kind of individual

13    medical diagnosis or offer of proof, just that

14    the   request   was   made   and   the   appropriate

15    documentation was, in fact, submitted putting the

16    Agency on notice.

17              JUDGE DOHNJI: I do agree with that.

18    With that I think we're going to move on with

19    this line of questioning.

20              MR. MARTINI: Do I have a chance to

21    respond, Your Honor, or --

22              JUDGE DOHNJI: What did you say, I'm

1    sorry?

2              MR.  MARTINI:  Do  I  have  a  chance  to

3    respond to that or you've already ruled on the

4    objection?

5              JUDGE  DOHNJI:  You  can  go  ahead  and

6    respond.

7              MR.  MARTINI:  All  right.   I  was

8    offering this to in case Ms. Fowler's testimony

9    that her mother was suffering from excruciating

10   pain while working at ABRA.  These documents make

11   mention of mild pain and moderate symptoms.  That

12   was the purpose I was trying to get at but --

13             JUDGE  DOHNJI:  Okay.   And  your

14   objection is noted.  And because we do have the

15   documents that speak for themselves we're going

16   to use those and like we stated the only reason

17   we're allowing all those document in is just for

18   the purpose of seeing the timeline of her FMLA

19   worker's comp as it relates to the PIP.  So,

20   we're just going to go ahead and move on from the

21   final question at this point.

22             MR. MARTINI: Okay, thank you.

1              BY MR. MARTINI:

2        Q    Ms. Fowler, you testified that you

3    never met Karen Jackson, right?

4        A    No, I don't recall — ah, yes, I do

5    recall meeting her, yes, one time.

6        Q    Okay.

7        A    At a lunch break when I dropped off

8    paperwork.

9        Q    I'm sorry, I couldn't hear you.  Where

10   did you meet her?

11       A    I met her at my mom's job when we were

12   dropping off paperwork.

13       Q    Okay.  How do you know that the Agency

14   knew the reason for your mom's request for her

15   change of alternate work schedule?

16       A    Can you repeat that question.

17       Q    Yes.  You testified that you knew that

18   ABRA knew the reason why your mother was

19   requesting to change her alternate work schedule,

20   right?

21       A    Yes, because she — what happens is

22   that sometimes the day that — when she's off, her

1    AWS was on a Monday, sometimes her appointments

2    would be on a Monday so you have to notify the

3    supervisor and let them know that you're going to

4    take another day and come in on your day off so

5    that you can make up for the day that you missed.

6    And you have to let them know why.

7        Q    So, it's your testified that ABRA knew

8    because the rules required that you tell your

9    employer if you're going to change your alternate

10   work schedule, why you're doing that?

11       A    Yes, for your day.  You as an agent

12   had to get it confirmed.

13       Q    All right.  I have nothing further,

14   Mr. Tucker may but I appreciate your time, ma'am.

15            JUDGE DOHNJI: Mr. Tucker, do you have

16   any further questions?

17            MR. TUCKER: No, Your Honor.

18            JUDGE DOHNJI: Okay.  Thank you for

19   testifying today, Ms. Fowler, and if we do need

20   you in the future Mr. Tucker is going to get a

21   hold of you.  Thank you and feel free to go.

22            THE WITNESS: Thank you.  Have a good

1    day.

2                    (Witness excused.)

3                    JUDGE DOHNJI: Mr. Tucker, who is your

4    next witness?

5                    MR.   TUCKER:  I  don't  know  if  Mr.

6    Martini  will  still  have  Ms.  Camille  Robinson

7    available?

8                    MR. MARTINI: We can take a few minutes

9    to find out.

10                   JUDGE DOHNJI: Sure.

11                   MR.  MARTINI:  When  I  contact  her  for

12   what it's worth, Mr. Tucker, can you still hear

13   me?

14                   MR. TUCKER: Yes.

15                   MR.  MARTINI:  How  long  do  you  expect

16   Ms. Robinson to testify?

17                   MR. TUCKER: An hour, half, you know,

18   45 minutes, tops.

19                   MR. MARTINI: Okay.  I don't think that

20   should be a problem, sir.

21                   (Whereupon, the above matter went off

22   the record at 4:33 p.m. and resumed at 4:36 p.m.)

1        JUDGE DOHNJI: We are back on the

2    record. We're going to have the Court Reporter

3    swear Ms. Robinson in and then we're going to

4    proceed.

5        Mr. Tucker, your witness.

6        MR. TUCKER: Thank you, Judge.

7        JUDGE DOHNJI: I'm sorry, Mr. Tucker,

8    before you go, there's a lot of feedback already.

9        Ms. Robinson, do you see the mute

10   button?  There's a drop-down arrow.  Will you

11   select that and click on settings.  It should

12   prompt a box to pop up with it, do you see that?

13       THE WITNESS: You said the blue button?

14       JUDGE DOHNJI: No, the mute button.

15   Next to the mute button.  Next to the mute

16   button.

17       THE WITNESS: Yes.

18       JUDGE DOHNJI: There's a drop-down

19   arrow.

20       THE WITNESS: Uh-huh.

21       JUDGE DOHNJI: Click the button now and

22   a box will pop up for settings.

1             THE WITNESS: Yes.

2             JUDGE DOHNJI: If you click on

3  settings. Okay. There should be towards the

4  bottom you should see a box that say background

5  noise. Click that.

6             THE WITNESS: Okay, done. Thank you.

7             JUDGE DOHNJI: Okay, Mr. Tucker, thank

8  you. Sorry about that.

9             MR. TUCKER: Okay. Thank you, Judge.

10  Whereupon,

11             CAMILLE ROBINSON

12  was called as a witness for the Employee and

13  after having been first duly sworn, was examined

14  and testified as follows:

15             DIRECT EXAMINATION

16             BY MR. TUCKER:

17     Q   Ms. Robinson, by whom are you

18  employed?

19     A   Can you hear me?

20     Q   Can now.

21     A   Okay.   District of Columbia

22  government, Alcoholic Beverage Regulation

1 Administration.

2   Q And in what capacity?  What's your

3 current job title?

4   A Administrative Officer.

5   Q And in that capacity, what are your

6 job duties and responsibilities?

7   A Overall my job duties are Agency

8 operations, internally. +Human Resources, budget,

9 procurement, public affairs.

10   Q And are you responsible for handling

11 or would it be fair to say you're responsible for

12 handling   FMLA   paperwork   and   workman's

13 compensation requests?

14   A Yes, I am.

15   Q Okay.  Did there come a time when you

16 received a request on behalf of Ms. Margaret

17 Fowler?

18   A A request for what?

19   Q FMLA.

20   A Yes.

21   Q Okay.  And did there come a time when

22 you also received a request or paperwork relating

1    to a worker's compensation claim?

2         A    That's   not   something   in   my   memory

3    exactly.

4         Q    Okay.   But you are recalling the FMLA

5    paperwork, is that correct?

6         A    Yes, I am.

7         Q    Okay.  And let me see.  Ms. Robinson,

8    I'm showing you what's been marked — well, it's

9    in evidence as Employees 4.  Do you see that?

10        A    I don't have any evidence before me.

11   I never received anything.

12        Q    Okay.

13             JUDGE DOHNJI: Mr. Martini, do you have

14   the  copy  of  the  employee's  document  that  you

15   could help us share?

16             MR. MARTINI: I do.

17             JUDGE  DOHNJI:  Okay.    If  you  don't

18   mind, Mr. Tucker.

19             MR. TUCKER: I don't.

20             JUDGE DOHNJI: Okay.

21             MR.  MARTINI:  All  right.    Just  one

22   second.

1          MR. TUCKER: Clearly the Government's

2     wifi is better than private wifi.

3          MR. MARTINI: Have to get it from

4     Verizon.  Okay.  Just let me know is everything

5     is in order.

6          MR. TUCKER: Okay.  If you could scroll

7     down.

8          BY MR. TUCKER:

9     Q     Do you see that, Ms. Robinson?

10    A     Yes, I do.

11    Q     Okay.

12         MR. TUCKER: If you could scroll down.

13         MR. MARTINI: This keep scrolling until

14    you're finished.

15         MR. TUCKER: Okay.  All right.  Keep

16    going.  Okay.  Stop right there.

17         BY MR. TUCKER:

18    Q     Do you see what's been in evidence as

19    Employee's 4?  I'm showing you, Ms. Robinson

20    what's been marked already as Employee's 4, do

21    you recognize this document?

22    A     No, it's no readily, no.

1          Q     Okay.   If  an  employee  was  making  a

2     request  for  --  making  a  claim  for  worker's

3     compensation under the Workman's Compensation Act

4     are  these  part  of  the  forms  that  an  employee

5     would submit, if you know, Ms. Robinson?

6          A     Yes, it looks like it is part of the

7     forms.

8          Q     Okay.

9                MR. TUCKER: Ryan, if we could show her

10    Employee's 4.

11               MR. MARTINI: This is Employee's 4.

12               MR. TUCKER: Employee's 2.

13               MR. MARTINI: Can you see now?

14               MR. TUCKER: I  see  one.   All  right.

15    There goes 2.  All right.  Right there.

16               BY MR. TUCKER:

17          Q     Ms.  Robinson, this is Employee's 2 in

18    evidence.  Earlier when you were asked whether or

19    not the employee submitted a request for FMLA is

20    this part of the paperwork that you're talking

21    about?

22          A     Yes, it is.

 1          Q      And if you recall —

 2          MR.  TUCKER:  You  can  scroll  down  a

 3     little bit.

 4          BY MR. TUCKER:

 5          Q      Is that your signature at the bottom?

 6          A      Yes, it is.

 7          Q      Okay.    And   it   appears   that   the

 8     certificate by Ms. Fowler on July 26, 2019, is

 9     that correct?

10          A      Yes.

11          Q      Okay.   And  it  appears — and  then

12     accompanying medical records you see page 10 of

13     97  pages,  do  you  recall  that  at  the  time  of

14     submission   were   additional   medical   records

15     attached or submitted to this request?

16          A      Yes, I believe a certification from

17     the physician was attached.

18          Q      Okay.

19          MR. TUCKER: Thank you for the slide.

20          BY MR. TUCKER:

21          Q      And when an employee makes a request

22     for submission for FMLA at the time and supplies

1    this necessary medical documentation from an HR

2    perspective, Ms. Robinson, what, if anything,

3    does the Agency do at that time?

4         A    We review the document and review the

5    request for certification and sign it.

6         Q    To acknowledge the request and to

7    acknowledge that the request was actually

8    received and submitted, is that correct?

9         A    Yes, to acknowledge that the request

10   was received.

11        Q    Okay.

12             MR. MARTINI: I'm sorry, you're done

13   with that on the screen here?

14             MR. TUCKER: Yes.  Thank you, Ryan.

15             MR. MARTINI: No problem.

16             BY MR. TUCKER:

17        Q    Ms. Robinson, do you recall at any

18   point Mr. Gordy contacting you requesting

19   verification as to whether or not Ms. Fowler had

20   submitted an FMLA application?

21        A    No, I do not.

22        Q    And do you recall how you received

1       this application?

2               A       I believe I received it through email.

3               Q       Okay.   Was that from her daughter,

4       Lori Fowler?

5               A       I don't recall.

6               Q       Okay.  And at any point, Ms. Robinson,

7       did you advise Ms. Fowler's supervisor, Mr.

8       Gordy, that Ms. Fowler had actually made a

9       request for FMLA?

10              A       That I don't recall.

11              Q       Okay.   Well, let me ask you, under

12      normal practice is that something that the

13      supervisor should be notified of when an employee

14      makes a request for FMLA?

15              A       NO, because it contains confidential

16      information about their medical history.

17              Q       Let me ask you.   Not particular, I

18      mean, wouldn't a supervisor benefit from knowing,

19      not the particular medical information but just

20      that the person, in fact, requested the FMLA

21      submission and application and consideration so

22      that if a supervisor was potentially looking to

1    assign additional duties or what have you they

2    would have that added information to consider?

3         A    Well, you can notify the manager of

4    the employee that they applied for FMLA but that

5    tends to draw in other conversation as to their

6    confidentiality of their medical record.  So,

7    then you would have to get into, well, this is

8    the reason why you can't give that employee more

9    information.

10         Q    At any point are you familiar with Ms.

11    Margaret Fowler?

12         A    Yes, I am.

13         Q    Okay.  And are you familiar with

14    working with her at the Agency?

15         A    Yes.  I've only interacted with her on

16    a human resources basis.

17         Q    Okay.  At any point had she complained

18    to you or made it known to you that she was

19    suffering from stress-related work issues?

20         A    Ms. Fowler complained about a lot of

21    issues and what I told her was she needed to

22    submit it in writing.